DICK GIARRANTANO *v.* ZONING BOARD OF
APPEALS OF THE CITY OF
NORWICH ET AL.
(AC 19519)
(AC 19527)

Schaller, Spear and Hennessy, Js.

Argued June 2—officially released October 17, 2000

*Michael P. Carey*, for the appellant (defendant Rodney Green).

*Marc Mandell*, assistant corporation counsel, for the appellant (named defendant).

*Beth A. Steele*, for the appellee (plaintiff).

*Opinion*

SCHALLER, J. The defendant Rodney Green, in AC 19519, and the defendant zoning board of appeals of the city of Norwich (board), in AC 19527, appeal from the judgment of the trial court sustaining the appeal of the plaintiff, Dick Giarrantano, from the board's decision to grant variances to Green that would permit him to build a thirty-six unit hotel on his commercially zoned property. The trial court determined that the record did not support the board's conclusion that a hardship existed. We reverse the judgment of the trial court.

The following facts and procedural history are relevant to a disposition of these appeals. The subject prop-

erty in this case is located at 336-360 West Main Street, Norwich, in a general commercial zoning district. On or about October 10, 1996, Green acquired ownership of the property from a foreclosing bank. When Green acquired the property, a nonconforming residence existed on the property. Thereafter, it became Green's intention to construct a thirty-six unit hotel on the property. On December 18, 1997, Green submitted an application to the board seeking variances from § 12.1 of the Norwich Zoning Code of Ordinances (code) to reduce the twenty foot front yard setback to fifteen feet, and from § 3.15 of the code to reduce the sixty foot buffer strip to twenty feet. A public hearing on the application was held on January 13, 1998, at which Green argued that because of the topography and narrowness of the property, a strict application of the code would deprive him of the reasonable use of his property, and that the variances were therefore warranted.[1]

Michael Carey, attorney for Green, explained to the board that the buffer requirement "would in fact, in

[1] In setting forth the powers and duties of the board, § 19.1.3 of the code provides in relevant part: "To vary the strict application of any of the requirements of this ordinance in the case of an exceptionally irregular, narrow, shallow, or steep lot or other physical conditions for which strict application would result in exceptional difficulty or unusual hardship that would deprive the owner of the reasonable use of the land or building involved, but in no other cases. No variance in the strict application of any provision of this ordinance shall be granted by the [board] unless it finds:

"(a) That there are special circumstances or conditions fully described in the findings of the board, applying to the land . . . for which the variance is sought, which circumstances or conditions are peculiar to such land . . . and do not apply generally to land . . . in the neighborhood . . .

"(b) That, for reasons fully set forth in the findings of the board, the aforesaid circumstances or conditions are such that the strict application of the provisions of this ordinance would deprive the applicant of the reasonable use of such land . . . and the granting of the variance is necessary for the reasonable use of the land . . . and that the variance as granted by the board is the minimum variance that will accomplish this purpose; and

" (c) That the granting of the variance will be in harmony with the purposes and intent of these regulations, and will not be injurious to the neighborhood or otherwise detrimental to the public welfare. . . ."

this case, under the circumstances, create an unusual hardship depriving the applicant reasonable use of the property." Carey also stated that "it's our position that the variances we seek here on this project under the conditions existing at this property, in particular this sort of slope and the narrowness of the lot, will create a project that is fully consistent, fully harmonious with the purposes and intent of the regulations that we ask you to vary. . . . It's our contention [under § 19.1.3 (b) of the code], that because of [the slope and narrowness of the lot], if the variance isn't granted and the regulations are applied in their strict letter that would in fact deprive the applicant of the reasonable use of his land in this case." Green testified that "[i]f we were to follow the exact zoning regulations, if we did everything absolutely required, we would have setbacks, we would have buffers and everything, and you would have thirty-nine feet of land left to do anything. That makes it basically unusable. You're in a situation where you try to make anything out of this abandoned, derelict property, something has to, and something's got to give somewhere." Green also testified that "[h]ardship is defined by the [code as] when a condition exists that prevents the reasonable use of the property. Doesn't mean it's taken from you, it doesn't mean that you can't do anything at all with it. It just says for reasonable use. There are things that we can do [there] on that property without being here before you people. There are a lot of things we can do."

Regarding the nonconforming house, Green testified that "[t]here was no way to even to try to restore or save it. It had all been left abandoned, the utilities on it, the plumbing pipes burst, it was just a total nightmare." Green also testified that he was first approached about the sale of the house about one and one-half years before the hearing and that the house was empty then. Negotiations ensued and Green, upon returning from

vacation in January, 1997, returned a telephone call from the mortgage company at which time the house had been empty "for a good year, year and a half." Green stated, "I had been on the property several times looking at it . . . seeing the condition of it. It was horrible. I mean it was absolutely horrible. I found it difficult to believe that people were living in there in the condition it was in. But they had been. We went and took possession . . . ." At the conclusion of the public hearing, the board granted the variances by a four to one vote on each.

The plaintiff, an abutting landowner, appealed to the Superior Court from the board's decision. The plaintiff argued that the board had acted illegally, arbitrarily and in abuse of its discretion in that (1) Green had not established to the board the existence of a hardship and (2) the variances substantially affected the comprehensive zoning scheme.

In a memorandum of decision, the court sustained the plaintiff's appeal, concluding that "the record does not support the conclusion that a reduction in usable space would deprive [Green] of the reasonable use of his property, thereby creating a hardship." The court noted that, although individual members of the board stated reasons for voting to grant the variances, the board did not state a collective reason for its action. Accordingly, the court searched the record to determine whether the evidence before the board supported its decision to grant the variances.

The court noted that a review of the record revealed that the only evidence of hardship that Green had presented to the board was the reduction in usable space that the code would impose due to the property's topography. The court concluded from the record that "the board granted the variances because 'the depth of the lot and topography of the land' and the 'shallowness of

the lot' required [relief]." The court further concluded that "[t]he [board's] primary reason for granting the variances . . . was the reduction in usable space due to the literal application of regulations [§§] 12.1 and 3.15."

The court determined that the board's conclusion was not supported by the record because (1) Green had stated before the board that "[t]here are things that we can do . . . on that property without being before [the board] . . . [t]here are a lot of things we can do," (2) a residential home currently exists on the property and the property may therefore be used for residential purposes as well as other commercial purposes besides the hotel without the variances and (3) the application of the code does not destroy the value of the property for any of the uses to which it could reasonably be put to the level of confiscation. Because the court concluded that the record did not support a finding of hardship, it did not address the plaintiff's arguments regarding whether the variances would substantially affect the comprehensive zoning plan. We granted the board's and Green's petitions for certification to appeal to this court, and these appeals followed. Additional facts will be set forth where necessary.

"In reviewing the actions of a zoning board of appeals we note that such a board is endowed with a liberal discretion, and its [actions are] subject to review by the courts only to determine whether [they were] unreasonable, arbitrary or illegal. . . . The burden of proof to demonstrate that the board acted improperly is upon the party seeking to overturn the board's decision. . . . In an appeal from the decision of a zoning board, we therefore review the record to determine whether there is factual support for the board's decision, not for the contentions of the applicant." (Internal quotation marks omitted.) *Francini* v. *Zoning Board of Appeals*, 228 Conn. 785, 791, 639 A.2d 519 (1994). If "a zoning author-

ity has stated the reasons for its actions, the reviewing court ought to examine the assigned grounds to determine whether they are reasonably supported by the record and pertinent to the considerations the authority was required to apply pursuant to the zoning regulations." *Havurah* v. *Zoning Board of Appeals*, 177 Conn. 440, 444–45, 418 A.2d 82 (1979). "Where a zoning board of appeals does not formally state the reasons for its decision, however, the [reviewing] court must search the record for a basis for the board's decision. *Connecticut Resources Recovery Authority* v. *Planning & Zoning Commission*, 225 Conn. 731, 743, 626 A.2d 705 (1993)." *Bloom* v. *Zoning Board of Appeals*, 233 Conn. 198, 208, 658 A.2d 559 (1995).

As the trial court noted, the board did not formally state the reasons for its decisions regarding the variances. The decisions were based on Green's hardship stemming from the reduction in usable space resulting from the strict application of the code. Accordingly, we must search the record to determine whether a basis exists for the decisions.

We first address the trial court's standard of review regarding hardship. The court stated that "[t]he financial impact must be such that the board could reasonably find that the application of the regulations to the property greatly decreases or practically destroys its value for any of the uses to which it could reasonably be put and where the regulations, as applied, bear so little relationship to the purposes of zoning that, as to particular premises, the regulations have a confiscatory or arbitrary effect." (Internal quotation marks omitted.) Under that standard, the court concluded that the property value was not destroyed in this case. The test applied by the trial court was adopted from *Grillo* v. *Zoning Board of Appeals*, 206 Conn. 362, 369, 537 A.2d 1030 (1988). As this court pointed out in *Stillman* v. *Zoning Board of Appeals*, 25 Conn. App. 631, 636, 596

A.2d 1, cert. denied, 220 Conn. 923, 598 A.2d 365 (1991), "[t]his test is used in the extreme situation where the application of a regulation renders property practically worthless, and that loss of value alone amounts to a hardship. . . . Although satisfying this test is a valid means of establishing a hardship, it is not exclusive." (Citation omitted.) Green did not argue before the board that the application of the code would destroy the value of his property, but that the literal application of the code would deprive him of the reasonable use of his land.

"A variance may be granted if the literal enforcement of a regulation causes exceptional difficulty or hardship because of some unusual characteristic of the property." Id. Green testified that the application of the two ordinances sought to be varied would leave thirty-nine feet on which to build. The context of his testimony, together with the statements of his attorney, indicates that he attributed the deprivation of reasonable use to the peculiar narrowness and topography of the property. From Green's evidence, the board was justified in finding that Green would suffer unusual hardship that would deprive him of the reasonable commercial use of his property if the code were applied strictly.[2] The board's findings regarding hardship are, therefore, not unreasonable, arbitrary or illegal.

The plaintiff argues, as the court concluded, that the existence of the nonconforming residence on the property affords Green a reasonable use to which the property may be put. Green and the board counter that the record establishes that the nonconforming use had been abandoned under the code with the passage of time and that because the code prohibits the revitalization

---

[2] We note that Green's statement that "[t]here are things that we can do [there] on that property," when heard in context, could well have been understood by the board to refer to uses that Green believed were not reasonable, although permissible.

of an abandoned nonconforming use, such use was not an option for Green.

We note that the board did not determine whether the nonconforming use had been legally abandoned. This question cannot properly be resolved by either this court or the trial court based on the record in this case. Such a determination, however, is not necessary to our resolution of this claim. A commercial use is clearly permitted as of right under the code because Green's property is located in a commercial district. "His right to use the lot and building for a permitted use is protected by law." *Petruzzi* v. *Zoning Board of Appeals*, 176 Conn. 479, 484, 408 A.2d 243 (1979). Therefore, although Green conceivably may have the right to use the land for residential purposes based on an existing nonconforming use, he does have the right under the code to use it for commercial purposes. The proper scope of the board's inquiry regarding hardship is therefore whether he can reasonably do so. The record in this case demonstrates support for the board's decision that Green was deprived of reasonable use of his property under the provisions of the code.

The granting of a variance has two basic requirements: "(1) the variance must be shown not to affect substantially the comprehensive zoning plan, and (2) adherence to the strict letter of the zoning ordinance must be shown to cause unusual hardship unnecessary to the carrying out of the general purpose of the zoning plan." (Internal quotation marks omitted.) *Grillo* v. *Zoning Board of Appeals*, supra, 206 Conn. 368; *Smith* v. *Zoning Board of Appeals*, 174 Conn. 323, 326, 387 A.2d 542 (1978); see footnote 1 of this opinion. As we have noted, the trial court, having found that the record did not support a finding of hardship, did not address or decide the plaintiff's claim that the variances substantially affected the Norwich comprehensive zoning

scheme. Accordingly, we must remand the case to the trial court for a determination of this issue.

The judgment is reversed and the case is remanded for further proceedings to address the plaintiff's claims regarding the effect of the variances on the comprehensive zoning scheme.

In this opinion the other judges concurred.